## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| CANAL INSURANCE COMPANY, | Civil No. 11-772 (JRT/AJB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| GREAT WEST CASUALTY COMPANY, | |
| Defendant. | |

James F. Mewborn, **ARTHUR CHAPMAN KETTERING SMETAK & PIKALA**, 81 South Ninth Street, Suite 500, Minneapolis, MN 55402, for plaintiff.

Tamara L. Novotny, **COUSINEAU MCGUIRE CHARTERED**, 1550 Utica Avenue South, Suite 600, Minneapolis, MN 55416, for defendant.

This is a declaratory judgment action brought by plaintiff Canal Insurance Company ("Canal") against defendant Great West Casualty Company ("Great West"). The underlying facts giving rise to this action involve a trucking accident. Douglas Amundson Trucking ("DAT") had arranged for Tim Bartness, doing business as TB Trucking (collectively, "Bartness") to pick up and deliver a load of cargo for a third party. Bartness caused the accident while delivering this load. At the time of the accident, Bartness was driving a 2007 Kenworth truck that he was in the process of purchasing under a lease-to-purchase agreement with DAT. Bartness is a federally licensed motor carrier and was insured by Canal at the time of the accident. DAT is a

federally licensed motor carrier as well as a federally licensed broker, and was insured at the time of the accident by Great West.

Great West brings a motion for summary judgment on the issue of coverage, arguing that Great West has no coverage obligations for liabilities arising from the accident. Because material issues of fact remain regarding whether Bartness was an insured under the Great West insurance policy, the Court will deny Great West's motion.

## BACKGROUND

## I.   DAT'S METHODS OF CARGO TRANSPORTATION

DAT is a freight hauling company based in North Dakota that is licensed to operate as a federal motor carrier[1] and a federal broker.[2]   (Aff. of Tamara L. Novotny, Ex. 5 at 2-3, Nov. 30, 2012, Docket No. 16.)   Both of these licenses were in effect on December 1, 2009, when the accident at issue occurred.   (Novotny Aff., Ex. 3 (Dep. of Douglas Amundson ("Amundson Dep.") 63:19-64:13).)   DAT's business involves two potentially relevant methods of cargo transportation that impact whether the Great West Policy provides coverage – independent owner-operator transportation and broker transportation.

---

[1] A motor carrier is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

[2] A "broker" is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

DAT transports cargo using trucks and drivers provided by independent owner-operators.  (Amundson Dep. 10:21-22.)  These owner-operators lease their trucks to DAT, and operate under DAT's federal motor carrier authority while transporting loads on DAT's behalf.  (*Id.* 68:17-69:1.)  DAT's owner-operators lease their trucks to DAT pursuant to lease agreements which specify that DAT "shall have exclusive possession[,] control and use of the equipment, and shall assume full responsibility to the public, the shippers, and to all state and federal regulatory bodies or authorities having jurisdiction, during the entire period of the agreement."  (Novotny Aff., Ex. 8 at 2; *see also* Amundson Dep. 66:21-24.)  Additionally, the agreements provide that "the equipment is under the direction and control of [DAT]."  (Novotny Aff., Ex. 8 at 2.)  DAT is responsible for insuring its owner-operators.  (Amundson Dep. 67:21-24.)  When owner-operators lease their trucks to DAT they display DAT's federal motor carrier numbers on their trucks.  (*Id.* 68:2-5.)  Owner-operators also provide logs of their time and maintenance records to DAT.  (*Id.* 68:6-11.)

DAT also transports cargo as a broker.  When DAT brokers with a driver, the driver is responsible for providing insurance and federal operating authority.  (*Id.* 71:5-9.)  In a brokering situation, the driver may have his own insurance and be licensed as a federal motor carrier, or the driver may have insurance and operating authority through another carrier.  (*Id.* 12:10-15.)  Essentially, DAT finds the load, the driver transports the load, and then the driver pays DAT a percentage of the amount received for hauling the load as a finder's fee.  (*Id.* 12:14-16.)

## II.   RELATIONSHIP BETWEEN BARTNESS AND DAT

Between 2006 and 2008 Bartness drove a truck for DAT as a DAT employee.[3] (*Id.* 14:15-16, 15:7-15.)  After DAT terminated his employment, Bartness applied for and obtained his own federal motor carrier authority.  (*Id.* 17:20-18:2, 76:4-12.)[4]

### A.   The Lease Agreement

In December 2008, shortly after Bartness obtained his own federal motor carrier authority, DAT and Bartness entered into a lease agreement (the "Lease") whereby Bartness leased from DAT a 2007 Kenworth truck (the "Kenworth") that Bartness had previously operated as an employee of DAT.  (*Id.* 76:7-12; Novotny Aff., Ex. 7.)[5] Pursuant to the Lease, Bartness owed DAT $2,502.02 per month, which was paid by deducting $0.20 per mile from his earnings.  (Novotny Aff., Ex. 7 at 12.)  As a matter of practice, DAT simply deducted the per mile charge for all of Bartness' monthly miles.

---

[3] In addition to its owner-operator and broker methods of transportation, DAT transports cargo using trucks that are owned by DAT and operated by DAT employee drivers.  (Amundson Dep. 10:1-16.)

[4] No documentary evidence of Bartness' federal authority appears in the record.  The parties do not, however, dispute that Bartness did obtain his own federal operating authority that was in effect at the time of the accident.  Great West attempted to depose Bartness but was unable to locate him.  Therefore the only evidence about Bartness appears primarily in Amundson's deposition as well as in some of Canal's claim reports.

[5] Bartness also arranged to rent a trailer from DAT.  (Novotny Aff., Ex. 7 at 12; Amundson Dep. 28:9-10.)  Bartness paid ten percent gross per load for this rental, and DAT provided insurance for the trailer.  (Novotny Aff., Ex. 7 at 12; Amundson Dep. 28:11-12.)

(Amundson Dep. 24:3-17.)[6]  Therefore, in some months Bartness paid more or less than the $2,502.02 stated monthly rent, but on average was making his monthly payments. (*Id.*)

The Lease provided Bartness with an option to purchase the Kenworth at the end of its the thirty-nine-month term, stating that "[s]o long as no Event of default has occurred and is continuing at the expiration of the Minimum Term, [Bartness] shall have the option to (i) purchase the Equipment at fair value; (ii) negotiate an extension of the Lease; or (iii) return the Equipment to [DAT]."  (Novotny Aff., Ex. 7 at 9, 12.)  While the Lease was in effect, title to the Kenworth "remain[ed] with DAT at all times," and Bartness had "no right, title, or interest therein except as expressly set forth in this Lease."  (*Id.*, Ex. 7 at 9.)

Under the Lease, Bartness was responsible for maintaining and inspecting the Kenworth as well as paying taxes.  (*Id.*, Ex. 7 at 5; Amundson Dep. 91:22-93:1.)  The Lease did, however, require Bartness to make the truck, as well as Bartness' driving log, maintenance, and other records "available for inspection by [DAT]'s representatives." (Novotny Aff., Ex. 7 at 4.)  The Lease also required Bartness to "at [his] own expense acquire and maintain during the term hereof, such insurance, in such form and under such policies as shall be satisfactory to [DAT]" including all risk property insurance and comprehensive public liability insurance providing "coverage for any bodily injury,

---

[6] Although nothing in the Lease prevented Bartness from hauling for other entities, Bartness and DAT had an oral understanding that Bartness would haul exclusively for DAT to allow DAT to fully recoup payments through the $0.20 per mileage charge for Bartness' use of the truck.  (Amundson Dep. 24:18-26:25.)

death, or property damage which may be caused by or related to the Equipment or its operation in amounts satisfactory to [DAT].  Such language shall name [DAT] as an additional insured." (*Id.*, Ex. 7 at 5.)

### B.      The Brokering Arrangement

After obtaining his own federal motor carrier authority and entering into the Lease, Bartness began hauling loads for DAT.  DAT contends that these loads were carried pursuant to DAT's broker authority.  (Amundson Dep. 72:10-73:13.)  DAT and Bartness did not enter into a written agreement discussing their broker/carrier arrangement, but DAT's owner testified that he and Bartness had a verbal understanding that DAT would be brokering loads to Bartness.  (*Id.* 72:10-73:13.)  Bartness and DAT never entered into an owner-operator lease agreement.  (*Id.* 69:2-5.)

When Bartness transported cargo for DAT he used his own operating authority and placed his own "TB Trucking" placard on the Kenworth.  (*Id.* 62:13-16, 77:21-24.)  Before allowing Bartness to haul loads, DAT required Bartness to submit proof of his insurance and operating authority.  (*Id.* 73:14-20, 75:25-76:6.)  DAT was aware that Bartness passed an entry-level audit conducted by the federal government six months after obtaining his operating authority.  (*Id.* 76:20-77:16.)

While driving under his own motor carrier authority Bartness was responsible for inspecting and maintaining the Kenworth, as well as keeping records of inspections and maintenance.  (*Id.* 91:22-92:10.)  DAT fronted Bartness money for fuel and controlled the amount of fuel he could purchase each day, but Bartness reimbursed DAT for fuel expenses.  (*Id.* 29:6-30:4.)  Bartness was required to maintain driving logs and his driver

qualification file, obtain physicals, and comply with federally mandated substance abuse testing. (*Id.* 93:5-23.)  Additionally, Bartness purchased insurance for, and paid taxes on, the Kenworth. (*Id.* 92:24-93:3.)  In his application for insurance, Bartness listed DAT as an additional insured for auto liability coverage, and indicated that DAT's relationship to Bartness was one of "broker." (Novotny Aff., Ex. 2 at 16.)  Bartness also indicated in his application for insurance from Canal that his business class was "For Hire Trucking." (*Id.*, Ex. 2 at 13.)  However, the "Description of Operations" portion of the Truckers Underwriting Report accompanying his insurance policy, indicated that Bartness' operations did not include "for hire," "brokerage," or "owner-operator," but did include "contract" work. (*Id.*, Ex. 2a at 2.)  Prior to the accident, Bartness kept the Kenworth at his home. (Amundson Dep. 91:3-7.)

## III.    THE CANAL INSURANCE POLICY

Pursuant to the Lease, Bartness obtained commercial automobile insurance from Canal (the "Canal Policy") that was in effect from December 24, 2008, to December 24, 2009. (Novotny Aff., Ex. 2 at 3.)

The Canal Policy provides $1,000,000 in liability coverage, under which Canal promises to pay "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." (*Id.*, Ex. 2 at 23, 29.)  Bartness d/b/a TB Trucking is the named insured on the Canal Policy, and is the

only driver listed on the policy's "Driver Schedule" endorsement. (*Id.* Ex. 2 at 3, 22.)[7]

Additionally, the Kenworth is the only covered auto. (*Id.*, Ex. 2 at 24, 28.)

With respect to what individuals and entities are covered by the liability insurance, the Canal Policy, in combination with a Truckers Endorsement, provides:

**1. Who Is An Insured**

The following are "insureds":

**a.** You[8] for any covered "auto".

**b.** Anyone else while using with your permission a covered "auto" you own, hire or borrow except:
. . . .

(6) No coverage is afforded to any person, firm or organization using the described "auto" pursuant to any lease, contract of hire, bailment, rental agreement, or any similar contract or agreement either written or oral, expressed or implied.

(*Id.*, Ex. 2 at 29, 56.)

The Canal Policy also contains an "Other Insurance" provision, which, as modified by the Truckers Endorsement, provides

**a.** For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance.

. . . .

---

[7] DAT is also an insured under the Canal Policy through a Designated Insured Endorsement. (Novotny Aff., Ex. 2 at 62.)

[8] Throughout the Canal Policy "you" and "your" "refer to the Named Insured shown in the Declarations." (Novotny Aff. Ex. 2 at 28.) Bartness d/b/a TB Trucking is the named insured. (*Id.*, Ex. 2 at 3.)

    **e.** Regardless of the provisions of paragraph **a.** above, in the event the "auto" described in this policy is being used or maintained pursuant to any lease, contract of hire, bailment, rental agreement, or any similar contract or agreement, either written or oral, expressed or implied, the insurance afforded you shall be excess insurance over any other insurance.

(*Id.*, Ex. 2 at 36, 56.)

## IV.   THE GREAT WEST POLICY

DAT had commercial general liability insurance through Great West pursuant to a policy in effect from June 1, 2009, to June 1, 2010 (the "Great West Policy"). (Novotny Aff., Ex. 1 at 3.) Great West agreed to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." (*Id.*, Ex. 1 at 82.) DAT is the named insured on the Great West Policy. (*Id.*, Ex. 1 at 16.)

The Great West Policy coverage form, together with an endorsement, defines "insureds" as

    a.   You[9] for any covered "auto".

    b.   Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

        1.   Anyone who has leased, hired, rented, or borrowed an "auto" from you that is used in a business other than yours.

---

[9] "You" throughout the Great West Policy refers to DAT, the named insured. (Novotny Aff., Ex. 1 at 16, 80.)

(*Id.*, Ex. 1 at 74, 82.)

The Great West Policy provides $1,000,000 of liability coverage for covered autos.   (*Id.*, Ex. 1 at 18.)   The Great West Policy defines covered autos as (1) "specifically described autos" which are those autos listed in item three of the declarations; (2) "hired autos only" which include "only those 'autos' you lease, hire, rent or borrow"; and (3) "nonowned autos only" which include "only those 'autos' you do not own, lease, hire, rent or borrow that are used in connection with your business."   (*Id.*, Ex. 1 at 18-19, 80.)  The Kenworth is not listed in the schedule of autos which comprises the list of "specifically described autos."  (*Id.*, Ex. 1 at 5-15.)

The Great West Policy also contains a Transportation Broker or Freight Forwarder Operations Liability Exclusion Endorsement (the "Broker Endorsement") which states that "Liability Coverage shall not apply to transportation broker or freight forwarder operations of the 'insured'."  (*Id.*, Ex. 1 at 73.)

With respect to other insurance, the Great West Policy provides:

> 5.  OTHER INSURANCE – PRIMARY AND EXCESS INSURANCE PROVISIONS
>
> a.  This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a "trucker"[10] and pursuant to operating rights granted to you by a public authority.   This Coverage Form's Liability Coverage is excess over any other collectible insurance or self insurance for any covered "auto" while hired or borrowed from you by another "trucker". However, while a covered "auto" which is a "trailer" is

---

[10] The Great West Policy defines "trucker" as "any person or organization engaged in the business of transporting property by 'auto' for hire."  (Novotny Aff., Ex. 1 at 95.)

connected to a power unit, this Coverage Form's Liability Coverage is:

(1)  On the same basis, primary or excess, as for the power unit if the power unit is a covered "auto".

(2)  Excess if the power unit is not a covered "auto".

. . . .

c.  Except as provided in Paragraphs a. and b. above, this Coverage Form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you do not own.

(*Id.*, Ex. 1 at 91.)

## V.    DECEMBER 1, 2009 ACCIDENT

On or about December 1, 2009, DAT received a telephone call from Tri-Campbell, Inc. ("Tri-Campbell") regarding transporting a load of potatoes from a farm in North Dakota to various locations in the Midwest.  (Amundson Dep. 42:7-11.)  DAT ran approximately three to five loads a week for Tri-Campbell.  (*Id.* 50:20-51:3.)  Typically when DAT received a call from Tri-Campbell, DAT would review its availability for "owner/operators, company trucks, outside carriers, [and] independent carriers" to determine whether it had the capacity to haul that load.  (*Id.* 45:25-46:4.)  When Tri-Campbell called in December, DAT determined it had a truck available and agreed to take the load.  (*Id.* 46:14-21.)  When DAT agreed to haul the load, it did not designate a particular truck, and DAT's owner testified that Tri-Campbell did not care whether a DAT employee or another trucker hauled the load "as long as the load is covered," and

the driver was qualified.  (*Id.* 47:10-18.)[11]  DAT never communicated to Tri-Campbell whether the load would be carried by DAT employees or owner-operators or whether the load would be brokered.  (*Id.* 69:23-70:5.)

On December 1, 2009, Tri-Campbell faxed a Load Confirmation Sheet (the "LCS") to DAT reflecting that DAT had agreed to provide transportation for the potatoes. (Novotny Aff., Ex. 9 at 2.)  DAT described the LCS as a "binding contract between a shipper and a carrier."  (Amundson Dep. 44:18-21.)  The LCS stated the pickup date, delivery date, stops, and compensation to be paid on the load.  (Novotny Aff., Ex. 9 at 2.) Additionally, the LCS listed DAT as the "carrier" and listed Tammy Rudnik from Tri-Campbell as the "broker."  (*Id.*)  The LCS further provided that it governed the movement of freight "between 'Broker' and 'Contract Carrier,'" and that "[i]t is agreed that [DAT] and [DAT's] driver are responsible for all shortages, damages, and any late delivery fees assessed to [Tri-Campbell] due to failure to deliver when due."  (*Id.*) Pursuant to this language "[DAT] ha[d] responsibility to get the load to its . . . destination as it appeared on the [LCS]."  (Amundson Dep. 45:3-10.)  Other than the LCS and bills of lading, no other written agreement defined Tri-Campbell's relationship to either DAT or Bartness.  (Novotny Aff., Ex. 4 (Dep. of William Campbell ("Campbell Dep.") 15:21-16:6; Amundson Dep. 45:11-17.)

---

[11] A corporate representative from Tri-Campbell testified that he was unaware whether, in a hauling situation like the one from December 1, 2009, Tri-Campbell required DAT to deliver the loads using its own employees or owner-operators, or whether DAT could rebroker the load.  (Novotny Aff., Ex. 4 (Dep. of William Campbell ("Campbell Dep.") 16:14-23, 21:19-22:7).)

Although DAT's owner could not remember the precise sequence of events related to the December 1, 2009 load, he testified based on his typical practices that after receiving the LCS, DAT would have contacted Bartness and notified him of the availability of a load. (Amundson Dep. 47:24-48:10.) At that point, Bartness could have accepted or declined the load. (*Id.* 48:11-13.) Because Bartness accepted, DAT would have told him verbally when and where to pick up the load. (*Id.* 48:18-23, 49:6-16.) DAT would also have coordinated with Bartness regarding which of DAT's trailers Bartness should use for the load. (*Id.* 52:16-21.) Bartness would then have received the bills of lading directly from Tri-Campbell when he picked up the load, setting forth the specific delivery instructions. (*Id.* 50:1-8.)[12] DAT did not provide Bartness with directions or route information, and DAT never took possession of the cargo prior to the December 1, 2009 accident. (*Id.* 69:18-22, 78:15-19.)

After picking up the load of potatoes on December 1, 2009, Bartness was involved in an accident with two other vehicles that resulted in injuries to three individuals. (Aff. of Curtis D. Ruwe, Ex. 1 at 3-4, Dec. 21, 2012, Docket No. 20; Novotny Aff., Ex. 12 at 3-4.) Bartness called DAT to alert it that he had been in an accident. (Amundson Dep. 52:22-24.) DAT requested that law enforcement deliver the potatoes to its warehouse, and DAT found a different truck to finish hauling the load. (*Id.* 55:2-8.)

---

[12] Apparently DAT also received copies of the bills of lading. Canal ultimately contacted DAT to obtain bills of lading related to the accident, as Bartness was not in possession of them. (Novotny Aff., Ex. 10 at 3.)

DAT did not contact Great West about the December 1, 2009 accident because DAT had suffered no damage to its trailer or the cargo.  (*Id.* 98:25-99:5.)  After the accident, DAT reviewed its SAFER system profile, a website which gathers information about federal motor carriers such as accidents and failed roadside inspections.  (*Id.* 97:3-12.)  DAT's SAFER system profile listed the December 1, 2009 accident as one chargeable to DAT as a carrier.  (*Id.*)  DAT contacted the Federal Motor Carrier Safety Administration's North Dakota office to have the profile corrected because DAT believed that Bartness, not DAT, had been acting as a carrier for the load, and the accident was subsequently removed from DAT's profile.  (*Id.* 97:17-98:9.)  DAT did not provide any documentation of the accident, its own motor carrier authority, or Bartness' motor carrier authority in order to have the accident removed from its profile.  (*Id.* 97:24-98:3.)

Bartness contacted Canal after the accident.  (Novotny Aff., Ex. 10.)  According to Canal's claim notes, Bartness communicated that he was "working under his own authority" and in the process of purchasing the Kenworth "thus there was no lease agreement and no other viable insurance."  (*Id.*, Ex. 10 at 2-3.)  Although DAT's placards were allegedly not displayed on the truck at the time of the accident, (Amundson Dep. 80:17-20), the police report contained DAT's not Bartness' federal operating number, (Novotny Aff., Ex. 10 at 3).

## VI.   PROCEDURAL HISTORY

Canal sent Bartness a reservation of rights letter on March 9, 2010, stating that "[o]ur review of this matter reveals that one or more of the allegations of the claim against [Bartness] may not be covered under the above Canal policy.  (Novotny Aff.,

Ex. 11 at 2.)  The letter further stated that "[o]ur investigation to date of the subject claim

or loss has revealed that you were operating under the authority of, for the benefit of,

being paid by, lease[d] to and under the direction and control of [DAT]," and therefore

concluded that the Canal Policy provided only excess coverage.  (*Id.*, Ex. 11 at 3.)  In a

March 11, 2010 letter Canal indicated that "[e]vidently, we have a double broker

situation.  TriCampbell [as the original broker] then brokered to [DAT] who brokered to

Insured."  (*Id.*, Ex. 12 at 2.)  On October 25, 2010, Canal sent a letter to Great West

admitting that the Canal Policy provided coverage for the accident, but contending that

coverage under the Great West Policy was primary.  (*Id.*, Ex. 13.)

On March 30, 2011, Canal filed a complaint in this Court seeking declaratory

judgment against Bartness, DAT,[13] and Great West.  (Compl., Mar. 30, 2011, Docket

No. 1.)  In its complaint Canal admits that the Canal Policy "provides coverage," but

alleges that such coverage is excess to the primary coverage provided by the Great West

Policy.  (*Id.* ¶ 22.)  The matter is now before the Court on Great West's motion for

summary judgment.

## ANALYSIS

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material

fact and the moving party can demonstrate that it is entitled to judgment as a matter of

---

[13] Canal has since voluntarily dismissed Bartness and DAT.  (Order for Dismissal, Aug. 9, 2011, Docket No. 6.)

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.        PRINCIPLES OF INSURANCE POLICY INTERPRETATION

It is undisputed that Minnesota law applies to the interpretation of the insurance policies in this case.[14]  Under Minnesota law the initial burden of demonstrating coverage rests with the insured, but "the insurer carries the burden of establishing the applicability of exclusions."  *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006).  Policy exclusions are "construed narrowly and strictly against the insurer."  *Id.*

---

[14] The Canal Policy is a Minnesota policy, and therefore the application of Minnesota law is a relatively straightforward proposition.  The Great West Policy, however, is a North Dakota policy, insuring a North Dakota company, and the accident took place in North Dakota, suggesting that if there was a conflict between Minnesota and North Dakota law, North Dakota law may apply under a choice of law analysis.  Both parties agree, however, that Minnesota law applies to interpretation of both policies.  Because both parties acquiesce to the application of Minnesota law, the Court declines to undertake a sua sponte choice of law analysis, and will apply Minnesota law.  *See In re Korean Air Lines Disaster*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) ("Unlike jurisdictional issues, courts need not address choice of law questions sua sponte."); *Sneyd v. Int'l Paper Co.*, 142 F. Supp. 2d 819, 823 n.2 (E.D. Mich. 2001) ("Because all parties acquiesce in the application of the substantive law of Michigan, the Court will apply Michigan law and need not conduct a choice-of-law analysis sua sponte.").

In determining whether coverage exists "general principles of contract interpretation apply." *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998).  The goal of insurance policy interpretation is to give effect to the parties' intent. *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013).  The Court must construe the terms of the policy "according to what a reasonable person in the position of the insured would have understood the words to mean." *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn. 1977).  Unambiguous language must be given its plain and ordinary meaning. *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986).  A policy is ambiguous if its language "is susceptible to two or more reasonable interpretations," *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008), and ambiguous language is construed in favor of the insured, *see Bobich v. Oja*, 104 N.W.2d 19, 24 (Minn. 1960).  Whether an insurance policy is ambiguous is a question of law for the Court. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979).  Additionally, the Court construes an insurance policy as a whole. *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 692 (Minn. 1997).

## III.   COVERAGE UNDER THE CANAL POLICY

As an initial matter, the Court finds that the Canal Policy provides coverage for the accident.  The Canal Policy provides that Canal will pay "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"  The Kenworth is specifically listed as a

covered auto.  Additionally Bartness is the named insured, and is an insured for purposes of the accident because the Canal Policy insures the named insured "for any covered 'auto.'"[15]  There is no dispute that there was an accident resulting in bodily injury and property damage that stemmed from Bartness' use of the Kenworth.[16]  Therefore, the Court concludes that the Canal Policy provides coverage for the accident.

## IV.   COVERAGE UNDER THE GREAT WEST POLICY

The Court must determine next whether the Great West Policy provides coverage to Bartness for the December 1, 2009 accident.[17]  The Great West Policy defines

---

[15] Great West argues at length that Bartness is potentially an insured under a different provision of the Canal Policy.  The Canal Policy provides that, in addition to the named insured, an insured can also be "[a]nyone else while using with your permission a covered 'auto' you own, hire, or borrow except: . . . No coverage is afforded to any person, firm or organization using the described 'auto' pursuant to any lease, contract of hire, bailment, rental agreement, or any similar contract or agreement either written or oral, expressed or implied.  (Novotny Aff., Ex. 2 at 29, 56.)  Great West goes to great lengths to argue that this provision does not preclude coverage for Bartness because Bartness was not using the vehicle pursuant to a lease, contract of hire, bailment, rental agreement, etc.  The Court need not address any of these arguments, because the provision referred to plainly does not apply.  Bartness is the named insured, and therefore falls under the first part of the definition of "who is an insured" which defines an insured as "you [the named insured] for any covered 'auto.'"  (*Id.*, Ex. 2 at 29.)  The exclusionary language identified by Great West only applies to the second part of the definition of "who is insured" which relates to "anyone else," other than the named insured.  Bartness is the named insured, not "anyone else" and therefore the language "No coverage is afforded to any person, firm or organization using the described 'auto' pursuant to any lease, contract of hire, bailment, rental agreement, or any similar contract or agreement either written or oral, expressed or implied," does not apply to him.

[16] Canal has never disputed coverage for the accident under the Canal Policy.  Indeed Canal has admitted in its initial correspondence with Bartness, its October 25, 2010 letter to Great West, its complaint, and its brief in opposition to the current motion for summary judgment that the Canal Policy provides coverage.

[17] As an initial matter the Court notes that Great West has not argued that the Broker Endorsement applies to bar coverage.  The Broker Endorsement provides that liability coverage

(Footnote continued on next page.)

"insureds" as "[DAT] for any covered 'auto'" and "[a]nyone else while using with [DAT's] permission a covered 'auto' [DAT] own[s], hire[s], or borrow[s]."  The only relevant type of covered autos for purposes of this dispute are "hired autos only" which are defined as "only those 'autos' you [DAT] lease, hire, rent, or borrow."  Therefore, in order for Bartness to be an insured:

> (1) Bartness must be "anyone else" other than DAT;

> (2) Bartness must have been using the Kenworth with DAT's permission;

> (3) the Kenworth must have been a "covered 'auto,'" meaning that DAT leased, hired, rented, or borrowed it;[18] and

> (4) DAT must have owned, hired, or borrowed the Kenworth.

It is clear that Bartness is someone else, other than DAT, and that Bartness had permission from DAT to use the Kenworth, therefore the Court will address only the two

_____

(Footnote continued.)

under the Great West Policy "shall not apply to transportation broker or freight forwarder operations of the 'insured'."  (Novotny Aff., Ex. 1 at 73.)   Great West contends that this language would only bar coverage if DAT, not Bartness, was seeking coverage in the present case.

[18] Covered autos also include "specifically described autos" which are vehicles explicitly listed in the schedule of autos.  The Kenworth does not appear in this list, and therefore cannot be a covered auto under the "specifically described autos" definition.  The second type of covered autos are "nonowned autos" which are autos DAT does "not own, lease, hire, rent or borrow that are used in connection with your business."  The Kenworth cannot fall under this definition in a manner that would allow Bartness to be an insured, because in order for Bartness to be a named insured under the "anyone else" definition of an insured, the covered auto must be owned, hired, or borrowed by DAT.  Bartness could not have simultaneously been using an auto that DAT owned, hired, or borrowed, and also be using an auto that DAT does not own, lease, hire, rent or borrow.  Therefore, this second type of covered auto cannot assist Bartness in demonstrating coverage.

remaining requirements.[19]  Both of these requirements overlap with respect to whether DAT hired the Kenworth.  In other words, if the Kenworth was hired by DAT, Bartness satisfies all of the elements required to qualify as an insured under the Great West Policy. The Court finds that a material issue of fact remains regarding whether DAT hired the Kenworth and will therefore deny Great West's motion for summary judgment.[20]

---

[19] The Court also notes that Great West does not argue that the exclusion preventing an entity from becoming an insured under the Great West Policy if the individual "leased, hire, rented, or borrowed" an auto from DAT and used it in a business other than DAT's applies to prevent Bartness from becoming an insured under the Great West Policy.  (Novotny Aff., Ex. 1 at 82.)  Even if Great West had met its burden of proving the applicability of this exclusion, *see Travelers Indem. Co.*, 718 N.W.2d at 894, the Court would find that it does not bar coverage in this case.  First, Great West argues that Bartness owned the Kenworth, and therefore was not leasing, hiring, renting, or borrowing the truck from DAT.  Second, whether Bartness was acting as a broker or a motor carrier, it is undisputed that Bartness was using the Kenworth as part of DAT's trucking business at the time of the accident.  DAT arranged transportation of the load as part of its business and received a percentage of Bartness' earnings for hauling the load.  In hauling the December 2009 load Bartness was also likely using the Kenworth in his own business, TB Trucking.  If the Kenworth had been used exclusively in Bartness' business at the time of the accident (and the other elements of the exclusion had been met) it appears that the exclusion would prevent Bartness from qualifying as an insured under the Great West Policy. The Court finds, however, that this exclusion is ambiguous with respect to whether there is coverage if the Kenworth was being used simultaneously in DAT's business and another entity's business.  In such an instance a reasonable insured could believe that as long as the truck was being used in DAT's business, coverage existed regardless of whether the truck was also being used in another business.  Accordingly, the Court would construe this ambiguity in favor of finding coverage, *Bobich*, 104 N.W.2d at 24, and would find that the exception does not apply to prevent Bartness from becoming an insured under the Great West Policy because the Kenworth was being used simultaneously in DAT's and Bartness' businesses.

[20] Great West contends that because DAT was acting as a broker at the time of the accident, it could not have been leasing, hiring, renting or borrowing the Kenworth from Bartness.  Great West's argument misses the mark for two reasons.  First, it is unclear based on the record whether DAT was acting as a broker at the time of the accident.  Although "[t]he difference between a carrier and a broker is often blurry," the key inquiry "is whether the party legally binds itself to transport, in which case, it is considered a carrier."  *CGU Int'l Ins., PLC v. Keystone Lines Corp.*, No. C-02-3751, 2004 WL 1047982, at *2 (N.D. Cal. May 5, 2004). Therefore, if an entity "accepted responsibility for ensuring delivery of the goods, regardless of who actually transported them, then [the entity] qualifies as a carrier.  If however [the entity] merely agreed to locate and hire a third party to transport the machines, then it was acting as a

(Footnote continued on next page.)

Because the Kenworth's hired status provides a possible basis for coverage and renders summary judgment inappropriate, the Court need not consider Canal's other potentially meritorious arguments that Bartness could alternatively qualify as an insured because DAT leased, rented, or owned the Kenworth.

The term "hire" is not defined in the Great West Policy. "When an insurer fails to define a coverage term, it is not entitled to a strict or limited definition that differs from the ordinary definition in order to avoid providing coverage." *Kresse v. Home Ins. Co.*, 765 F.2d 753, 755 (8th Cir. 1985). The Eighth Circuit has held that the term "hired auto" is ambiguous. *Id.* In *Kresse* the court provided several possible definitions of hired auto:

_____

(Footnote continued.)

broker." *Id.* In determining whether an entity was acting as a broker courts consider a number of nondispositive factors examining the level of control the entity exerted over the shipment and whether the entity held itself out as a broker. *See e.g., Mach Mold Inc. v. Clover Assocs., Inc.*, 383 F. Supp. 2d 1015, 1030-31 (N.D. Ill. 2005); *Just Take Action, Inc. v. GST (Americas) Inc.*, Civ. No. 04-3024, 2005 WL 1080597, at *5 (D. Minn. May 6, 2005); *CGU Int'l Ins.*, 2004 WL 1047982, at *2. The facts of this case raise genuine issues as to whether DAT was acting as a broker with respect to the December 1, 2009 load. For example, DAT did not provide routes or direction to Bartness, received a brokerage commission on Bartness' loads, and was listed as a broker on Bartness' application for insurance, suggesting that DAT may have been acting as a broker. But DAT listed itself as a carrier, not a broker, on the LCS, agreed to be responsible for delivering the load of potatoes, took control of the load after the accident, controlled Bartness' fuel, and retained the right to inspect Bartness' records and log, which facts suggest that a reasonable jury could conclude that DAT was acting as a motor carrier at the time of the accident, not a broker. Because summary judgment on the question of whether DAT was acting as a broker would be inappropriate, the Court cannot use a finding that DAT was acting as a broker to resolve the coverage dispute.

More importantly, whether DAT was acting as a broker is not dispositive on the question of whether DAT leased, hired, rented, or borrowed the Kenworth. None of these terms in the Great West Policy defining a covered auto contain a reference to "broker," and the Court must interpret the plain language of the insurance policy. *See Carolina Cas. Ins. Co. v. Ins. Co. of N. Am.*, 595 F.2d 128, 138 (3d Cir. 1979) ("[W]here the case is concerned with responsibility as between insurance carriers, and not with the federal policy of protecting the public, [Interstate Commerce Commission] considerations are not determinative, and a court should consider the express terms of the parties' contracts." (internal quotation marks omitted)).

(1) "The term generally is used to mean a vehicle owned by someone other than the insured which is leased to the insured pursuant to a lease agreement which calls for the owner to provide not only the vehicle, but also a driver for that vehicle while it is being used in the insured's business"; (2) "a hired auto under the policy is one whose temporary use has been engaged for a fixed sum"; and (3) "an automobile not owned by the named insured which is used under contract in behalf of, or loaned to, the named insured." *Id.* (citations and internal quotation marks omitted). *Kresse* involved a contract between Cass County (the named insured) and Kresse. *Id.* Kresse had accepted Cass County's offer to work as a gravel hauler. *Id.* In determining whether Cass County had hired Kresse's auto, the court considered a number of factors, explaining:

> Kress provided the County with the use of his truck and a driver in exchange for monetary consideration. Additionally, the county determined the route to be used and had the right to dismiss any driver that deviated from it. The trucks had specified hours of operation determined by the county. The County loaded the trucks and supervised the unloading. All truck owners were required to maintain a good credit rating and to provide proof of insurance coverage for all vehicles.

*Id.* Additionally, the County required Kresse to use a particular truck for the job. *Id.* at 755-56. Based on these facts, the Eighth Circuit concluded that a material issue of fact remained regarding whether Kresse had been hired by the County, and therefore determined that summary judgment was inappropriate. *Id.* at 756.

Courts generally consider the level of control an entity exerts over a truck for purposes of determining whether that truck was "hired" by the entity. *See U.S. Fid. & Guar. Co. v. Heritage Mut. Ins. Co.*, 230 F.3d 331, 335 (7th Cir. 2000) (determining whether the entity had hired trucks by considering whether the entity maintained the

trucks and paid for fuel, paid drivers directly for the amount of material they hauled, dictated the routes of the drivers, or otherwise exerted control over the drivers); *Toops v. Gulf Coast Marine Inc.*, 72 F.3d 483, 487-88 (5th Cir. 1996) (considering whether the hiring entity (1) furnished fuel or otherwise maintained the truck; (2) required the trucks to be a certain size or required a certain number of loads per day; (3) selected individual drivers; (4) could fire drivers; (5) assumed control of the truck or driver by directly loading or unloading). Additionally, whether the driver owned the truck and whether the driver hauled for other businesses, suggesting that the driver is an independent contractor and therefore not hired by the hauling entity, is a relevant consideration. Finally, of particular importance to the hiring inquiry is whether the entity could demand a particular vehicle – otherwise courts have concluded that the entity is merely "hiring" the service and not the "auto" as required by the language of the insurance policy. *See Occidental Fire & Cas. Co. of N. Am. v. Westport Ins. Corp.*, No. 02-8923, 2004 WL 2028616, *9 (E.D. Pa. Sept. 10, 2004).

The Court finds that summary judgment on this record is inappropriate as a genuine issue of fact remains regarding whether DAT hired the Kenworth. A number of factors indicate that the Kenworth may not have been a hired auto. For example, DAT did not provide routes or directions to Bartness, did not maintain the Kenworth, and did not load or unload the truck. Additionally, the Truckers Underwriting Report accompanying the Canal Policy indicated that Bartness' operations did not include "for hire" work.

A number of other factors, however, suggest that DAT did hire the Kenworth. DAT fronted the cost of fuel and restricted the amount of fuel Bartness could purchase for any particular trip. DAT also selected the trailer that Bartness would use. Pursuant to the lease, DAT had the right to inspect Bartness' truck as well as Bartness' maintenance and driver logs. DAT also required Bartness to provide DAT with proof of insurance, which suggests a level of control over the manner in which Bartness operated his truck and ultimately delivered the load. Additionally, Bartness indicated in his application for insurance from Canal that his business class was "For Hire Trucking." The record also reflects that Bartness never hauled for any entity other than DAT. Furthermore, although by default, when DAT hired Bartness it was hiring a particular driver and truck, because Bartness used only the Kenworth. Based upon these facts, the Court concludes that summary judgment on the issue of whether the Kenworth is a covered auto under the Great West Policy is inappropriate.

Therefore, the Court finds that material issues of fact remain regarding whether Bartness was an insured under the Great West Policy. Because a reasonable jury could conclude that DAT hired the Kenworth, Bartness could qualify as insured and therefore be entitled to coverage under the Great West Policy. Accordingly, the Court will deny Great West's motion for summary judgment.[21]

---

[21] Great West has also asked the Court to determine whether coverage under the Great West Policy is excess or primary. Because material issues of fact remain regarding whether there is coverage at all, the Court declines to consider at this time whether any possible coverage provided by the Great West Policy is excess or primary to any coverage under the Canal Policy. Furthermore, the "other insurance" clauses in both the Canal and Great West Policies implicate the factual issues addressed in this Order regarding whether DAT was acting as a broker and

(Footnote continued on next page.)

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that defendant's Motion for Summary Judgment [Docket No. 13]

is **DENIED**.

DATED:   September 18, 2013                    _____s/_ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                    United States District Judge

_____
(Footnote continued.)

whether the Kenworth was a hired vehicle, making summary judgment on the issue of primary or excess coverage inappropriate.